[Cite as *In re K.C.*, 2024-Ohio-1759.]

COURT OF APPEALS
FAIRFIELD COUNTY, OHIO
FIFTH APPELLATE DISTRICT

IN RE: K.C., J.C., & Z.C.

JUDGES:
Hon. W. Scott Gwin, P.J.
Hon. William B. Hoffman, J.
Hon. Craig R. Baldwin, J.

Case Nos. 2023 CA 00047, 2023 CA
00048 & 2023 CA 00049

O P I N I O N

CHARACTER OF PROCEEDINGS:      Appeal from the Fairfield County Court of
                               Common Pleas, Juvenile Division, Case
                               Nos. 2022 AB 0023, 2022 AB 0024 & 2022
                               AB 0025

JUDGMENT:                      Affirmed

DATE OF JUDGMENT ENTRY:        May 7, 2024

APPEARANCES:

For Appellee State of Ohio

R. KYLE WITT
Fairfield County Prosecuting Attorney

GENYLYNN COSGROVE
Assistant Prosecuting Attorney
239 West Main Street, Suite #101
Lancaster, Ohio 43130

For Appellant J.G.

JAMES S. SWEENEY
285 S. Liberty Street
Powell, Ohio 43065

For K.C.

CEDRIC COLLINS
P.O. Box 564
Pickerington, Ohio 43147

Guardian ad Litem

BRIAN HERZBERGER
2770 East Main Street, Suite #25
Columbus, Ohio 43209

For Fairfield County Child Protective Services

PAUL MORRISON
Fairfield County Prosecutor's Office
239 W. Main Street, Suite #101
Lancaster, Ohio 43130

*Hoffman, J.*

**{¶1}** In Fairfield App. Nos. 23-CA-47, 23-CA-48, and 23-CA-49, appellant J.G. ("Mother") appeals the October 25, 2023 Judgment Entry entered by the Fairfield County Court of Common Pleas, Juvenile Division, which terminated her parental rights with respect to her three (3) minor children ("Child 1," "Child 2," and "Child 3," individually; "the Children," collectively) and granted permanent custody of the Children to appellee Fairfield County Child Protective Services ("FCCPS").

## STATEMENT OF THE CASE AND FACTS

**{¶2}** Mother and E.C. ("Father") are the biological parents of the Children.[1] FCCPS received a report in early December, 2021, due to concerns Mother was smoking methamphetamine in front of the Children and the Children had access to drug paraphernalia. In addition, FCCPS received a report the Children were taken on "drug runs" and had witnessed incidents of violence between Father and Mother, in which Father was the aggressor. FCCPS made multiple attempts, including phone calls, unannounced home visits, and scheduled home visits, to speak with Parents to assess the concerns. Parents refused to engage or cooperate. When FCCPS made an unannounced visit on January 24, 2022, Child 1 advised FCCPS Mother was asleep and several minutes passed before Child 1 was able to wake Mother.

**{¶3}** Due to continued concerns and a lack of engagement, FCCPS sought an order of protective supervision, which the trial court granted on January 27, 2022. FCCPS filed complaints, alleging the Children were dependent, on the same day. The trial court

---

[1] Father is not a party to this appeal.

conducted a shelter care hearing on February 2, 2022, and placed the Children in the temporary shelter custody of FCCPS.

{¶4} Following an adjudicatory hearing on April 4, 2022, the trial court found the Children to be dependent and immediately proceeded to disposition. The trial court ordered the Children remain in the temporary custody of FCCPS. The trial court conducted review hearings on July 20, 2022, October 19, 2022, and January 27, 2020, and maintained the status quo each time. The trial court made reasonable efforts findings at each hearing. FCCPS filed a motion for permanent custody on April 4, 2023.

{¶5} The magistrate conducted a hearing on FCCPS's motion for permanent custody on August 15, 2023. The following evidence was presented at the hearing:

{¶6} Erynn Alexander, an intake caseworker, testified FCCPS received an initial report regarding the family on December 7, 2021, and, as a result, she began an investigation. Alexander explained she was not able to fully assess the concerns due to Mother's lack of cooperation.  Mother refused to comply with the initial assessment. The Children were ultimately removed from the home. FCCPS was unable to move forward with kinship placement with the maternal grandmother because she tested positive for methamphetamine.

{¶7} Rebecca Deem, who monitors FCCPS visits between parents and their children, testified she began overseeing visits between Mother and the Children in June, 2023. Deem described Mother as "very angry" when she came to one visit, explaining, "our visit was spent with her being angry with me, angry, you know, with the children.  She was just angry. And so she didn't interact most of the visit with the kids." Transcript of August 15, 2023 Proceedings at p. 146. During a visit on July 12, 2023, Mother "did not

participate with the kids in a visiting manner * * * she was angry. She told me she was angry." *Id.* Mother had two visits with the Children in August, 2023, which were "very good, very positive." *Id.* at p. 148. Deem recalled Mother interacted with the Children, playing and talking with them.

**{¶8}** Valkari Dietzel, a parent services support coordinator with FCCPS, supervised visits between Mother and the Children from March, 2022, until May, 2023.  Dietzel recalled Mother struggled with setting boundaries with the Children and, at times, Mother was distracted and failed to correct the Children's behaviors. Dietzel indicated "for the most part [the visits] were good." Tr. at p. 178. Mother's parenting time was moved from the agency to her home, then to grandmother's home after Mother lost her housing.

**{¶9}** On May 31, 2023, Dietzel contacted Mother several times about arranging a ride to the scheduled visit. Mother did not respond. Dietzel finally left a message stating she would have to cancel the visit if Mother did not contact her by 11:30 a.m. When Dietzel did not hear from Mother, Dietzel canceled the transportation for the Children and informed the foster parents the visit would not occur. Mother called Dietzel at 11:43 a.m., explaining she had been in the shower. Mother became upset when Dietzel informed her the visit had been canceled. During the conversation, Mother called Dietzel a "stupid bitch," and told Dietzel she "better watch herself. You're next." Tr. at p. 183.  As a result, a TAP plan (threat assessment plan) was put in place. From that point on, Mother's visits with the Children were supervised at the agency.

**{¶10}** Ashton Clark, the ongoing caseworker assigned to the family, testified the Children have been in their current foster home since January, 2023. The Children are

doing well in their placement. The foster mother reported Child 1 has some behavioral issues including lying and physical aggression towards Child 2 and Child 3.  Child 2 is primarily non-verbal, but is currently in speech therapy and making some progress.  The foster mother reported some behavioral concerns largely associated with Child 2's inability to speak.  Child 3 is developmentally on target.  The Children are bonded with the foster mother and her family. The foster mother has linked the Children with appropriate services to assure their needs are met.

{¶11} Clark detailed Mother's case plan, which required her to meet with her caseworker, in person, at least once a month; undergo a substance use and mental health assessment and follow all recommendations; participate in the random call and screen program; and maintain safe and stable housing. Clark noted Mother did not consistently participate in the random call and screen program. Mother "[o]verwhelmingly, * * * would not show up to her scheduled screens." Tr. at p. 205. Mother had been compliant with her substance use and mental health counseling during the six months prior to the hearing. Clark indicated Mother had been "relatively inconsistent in meeting with [her] on a regular basis." *Id.*  Mother met with Clark in June, 2023, but canceled their July meeting.

{¶12}  Between February 3, 2022, and January 12, 2023, Mother tested positive for tetrahydrocannabinol ("THC") 29 times,[2] positive for amphetamines two (2) times, and missed 66 tests. Mother had a clean test on January 13, 2023, then missed 56 tests between January 14, 2023, and August 4, 2023.

{¶13}  Based upon the recommendations of the guardian ad litem, Mother was referred for a full psychological assessment. The assessment was scheduled for July,

---

[2] THC is the main psychoactive ingredient in the cannabis plant.  https://WebMD.com/CBD vs. THC: What's the Difference?  Accessed 25 April 2024.

2023, but Mother canceled the appointment. Mother informed Clark she was in the hospital, but failed to provide verification of the hospitalization.

**{¶14}** On cross-examination, Mother testified she initially complied with her case plan and followed as much as she could until she "lost faith in all that."  Tr. at p. 27. Mother acknowledged she did not comply with drug screens, but denied using methamphetamine after the Children were removed. Mother lost her housing in April, 2023, after the friend with whom she was living passed away. She "was currently in the middle of trying to figure [her housing situation] out." Tr. at p. 31. Mother stated she did not miss any visits with the Children until the visits were moved back to the agency. Mother explained she "missed a few visits due to a lot of miscommunication."  Tr. at p. 35.  At the time of the hearing, Mother was earning $600.00/month, under the table, doing landscaping and painting. Mother stated she no longer has contact with Father.

**{¶15}** The magistrate issued her decision on August 25, 2023, recommending Mother and Father's parental rights be terminated and permanent custody of the Children be granted to FCCPS. Parents filed their respective objections to the magistrate's decision. FCCPS filed responses thereto.

**{¶16}** Via Judgment Entry/Orders on Objection to Magistrate's Decision filed October 25, 2023, the trial court overruled Mother and Father's objections.  The trial court found Parents "failed to demonstrate to the Court a CONSISTENT PATTERN of independent living and parenting that creates confidence in the Court that Mother and Father are able to manage sobriety and mental heal concerns while meeting the demands emotionally, physically, developmentally, educationally, and financially of [the Children]." October 25, 2023 Judgment Entry/Orders on Objection to Magistrate's Decision at p. 5.

The trial court further found the Children had been in the temporary custody of FCCPS for "twelve or more months of a consecutive twenty-two-month period" and granting permanent custody was in the best interest of the Children.

**{¶17}** It is from this judgment entry Mother appeals, raising as her sole assignment of error in all three (3) cases:

> THE JUVENILE COURT ERRED IN TERMINATING MOTHER'S PARENTAL RIGHTS AND GRANTING PERMANENT CUSTODY OF THE MINOR CHILDREN TO FCCPS.

**{¶18}** These cases come to us on the expedited calendar and shall be considered in compliance with App. R. 11.2(C).

F23-CA-47, F23-CA-48, F23-CA-49

I

**{¶19}** R.C. 2151.414 sets forth the guidelines a trial court must follow when deciding a motion for permanent custody. R.C. 2151.414(A)(1) mandates the trial court schedule a hearing and provide notice upon the filing of a motion for permanent custody of a child by a public children services agency or private child placing agency that has temporary custody of the child or has placed the child in long term foster care.

**{¶20}** Following the hearing, R.C. 2151.414(B) authorizes the juvenile court to grant permanent custody of the child to the public or private agency if the court determines, by clear and convincing evidence, it is in the best interest of the child to grant permanent custody to the agency, and that any of the following apply: (a) the child is not

abandoned or orphaned, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents; (b) the child is abandoned; (c) the child is orphaned and there are no relatives of the child who are able to take permanent custody; or (d) the child has been in the temporary custody of one or more public children services agencies or private child placement agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999.

**{¶21}** Therefore, R.C. 2151.414(B) establishes a two-pronged analysis the trial court must apply when ruling on a motion for permanent custody. In practice, the trial court will usually determine whether one of the four circumstances delineated in R.C. 2151.414(B)(1)(a) through (d) is present before proceeding to a determination regarding the best interest of the child.

**{¶22}** If the child is not abandoned or orphaned, the focus turns to whether the child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents. Under R.C. 2151.414(E), the trial court must consider all relevant evidence before making this determination. The trial court is required to enter such a finding if it determines, by clear and convincing evidence, one or more of the factors enumerated in R.C. 2151.414(E)(1) through (16) exist with respect to each of the child's parents.

**{¶23}** The second prong of the analysis requires the juvenile court to determine, by clear and convincing evidence, it is in the best interest of the child to grant permanent custody to the agency pursuant to R.C. 2151.414(D). R.C. 2151.414(B)(1). " 'Clear and convincing evidence is that measure or degree of proof which is more than a mere

"preponderance of the evidence," but not to the extent of such certainty as is required "beyond a reasonable doubt" in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established.' " *In re Z.C.*, 173 Ohio St.3d 359, 361, 2023-Ohio-4703, ¶ 7, quoting *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus.

{¶24}  In determining the best interest of the child at a permanent custody hearing, R.C. 2151.414(D)(1) mandates the trial court must consider all relevant factors, including, but not limited to, the following: (a) the interaction and interrelationship of the child with the child's parents, siblings, relatives, foster parents and out-of-home providers, and any other person who may significantly affect the child; (b) the wishes of the child as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child; (c) the custodial history of the child; (d) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody; and (e) whether any of the factors in division (E)(7) to (11) of R.C. 2151.414 apply in relation to the parents and child.

{¶25} Mother concedes the Children had been in the temporary custody of FCCPS for twelve or more months of a consecutive twenty-two-month period, but asserts the trial court's finding it was in the best interest of the Children to grant permanent custody to FCCPS was not based upon clear and convincing evidence.  We disagree.

{¶26}  As set forth in our Statement of the Case and Facts, supra, Mother failed to remedy the conditions which led to the removal of the Children from her care. Mother missed over 100 drug screens. Between February 3, 2022, and January 12, 2023, Mother tested positive for THC 29 times, amphetamines twice, and missed 66 tests. Mother had

a clean test on January 13, 2023, then missed 56 tests between January 14, 2023, and August 4, 2023.  In the last six (6) months of the case, Mother began to consistently attend substance use and mental health counseling.

**{¶27}** Mother also failed to meet with her caseworker on a consistent basis.  At the time of the hearing, Mother did not have stable housing.  Mother was referred for a full psychological assessment, but did not present at the scheduled appointment. Mother stated she was hospitalized at the time, but failed to provide verification of the hospitalization. Mother never moved beyond supervised visitation with the Children.

**{¶28}** The Children are currently together in a foster home and are doing well in their placement. The foster mother reported Child 1 has some behavioral issues including lying and physical aggression towards Child 2 and Child 3.  Child 2 is primarily non-verbal, but is currently in speech therapy and making some progress.  The foster mother reported Child 2's behavioral issues were largely associated with Child 2's inability to speak.  Child 3 is developmentally on target.  The Children are bonded with the foster mother and her family. The foster mother has linked the Children with appropriate services to assure their needs are met.

**{¶29}** Based upon the foregoing, we find there was clear and convincing evidence to support the trial court's finding a grant of permanent custody to FCCPS was in the best interest of the Children.

**{¶30}** Mother's sole assignment of error is overruled.

**{¶31}** The judgment of the Fairfield County Court of Common Pleas, Juvenile Division, is affirmed.


By: Hoffman, J.

Gwin, P.J.  and

Baldwin, J. concur